to suppose that this is also permissible under a Code abolishing all former rules of pleading, and requiring solely that the act constituting the crime should be plainly and concisely set forth?

It remains to consider whether this indictment in question contains a statement of the act constituting the crime of forgery, and gives the substance or purport of the alleged false entry with sufficient fullness to fairly apprise the defendants of the charge. The defendants are accused of forgery in the third degree, committed in the borough of Brooklyn on the 5th day of January, 1905. It is stated: First. That they made false entries with intent to defraud the city of New York, a municipal corporation. Second. That these false entries were made in an account or writing belonging to and appertaining to the business of the corporation, commonly known as the foreman's or dump sheet, intended and used for the purpose of showing the number of loads of snow and ice received from district No. 1, gang No. 2, for and on account of said municipal corporation. Third. That the false entries were certain words, figures, and letters which purported to certify and declare that one John Hanna, of No. 815 Classon avenue, Brooklyn, had employed in and with said district and gang for the account of the city 5 trucks with horses, and had with them removed 108 loads of snow and ice from the streets of Brooklyn, for which services the city was indebted to him in the sum of $35. Fourth. That these entries were false and untrue, and known to the defendants to be such when they made them. Briefly stated, the indictment alleges that these defendants, with intent to defraud the city, entered upon the dump sheet, a writing used by the city to record the loads of snow removed for its account, that John Hanna had removed 108 loads, for which $35 was due him, which entries were knowingly false. Clearly, this is forgery under section 515 of the Code, and for the reasons above stated I deem the indictment good and sufficient.

The demurrer is consequently overruled.

---

(46 Misc. Rep. 49.)

### In re DE VAUGRIGNEUSE'S WILL.

(Surrogate's Court, New York County. December, 1904.)

1. WILLS—UNDUE INFLUENCE—BURDEN OF PROOF.
   The chief beneficiary of a will had been trustee of the decedent during her lifetime, and controlled her estate at the time the will was executed. *Held*, that the burden was on him to show that the will was the free expression of the intention of testatrix.
   [Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 390, 393.]

2. SAME—FRAUD—PRESUMPTION.
   Where one who had had control of decedent's estate during her lifetime was the chief beneficiary under the will, no presumption arises, from the fiduciary relation, of fraud on the part of the beneficiary.
   [Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 390, 393.]

3. SAME—EVIDENCE.
   Where the draftsman of a will was selected by the sole beneficiary thereunder, but the will was executed after full and careful examination by

the testatrix, and an explanation of its effect, there is nothing to show undue influence on the part of the beneficiary.

Proceedings on the probate of the will of Sarah Morris De Vaugrigneuse. Probate decreed.

John S. Davenport, for proponent.

Bowers & Sands and Hoadly, Lauterbach & Johnson, for contestants.

THOMAS, S. The evidence upon which it is argued by the contestants that the decedent was of so low an order of intelligence that she should be classed as an imbecile does not lead me to that conclusion. She was at the time of her death, on April 22, 1904, of the age of about 68 years. It had never been necessary for her to take practical control of business affairs. Her life had largely been spent in her home, and her interests were mainly those of her household and of her church and circle of social friends. For many years her mother was a bedridden invalid, and this circumstance, with the infirmities of her advancing age, discouraged social activities. She was very nearsighted. She was corpulent and moved about with some difficulty. Her teeth were bad. She had in her later years a trouble with her salivary glands not uncommon to aged people. With no large or important interests, she found diversion in little things, and she was sometimes inquisitive. None of these things is at all inconsistent with a normal degree of intelligence, and they serve to explain nearly all of the circumstances proved by the contestants, and claimed to establish lack of testamentary capacity. The matters not thus covered are not important, and probable explanations are given or suggested by the evidence entirely consistent with average mental power. As furnishing much more than an offset to all of the testimony of alleged foolish or unconventional conduct of the decedent, a great number of her letters have been produced and offered in evidence both by the proponent and by the contestant. I do not recall any one of these letters, or any single sentence or phrase in any of them, which appeared to me, or which has been contended by counsel, to indicate any degree of insanity, imbecility, stupidity, or lack of a full, normal degree of intelligence. It may justly be said of them that they mainly contain observations concerning her health and personal comfort and her immediate surroundings and friends, and that they do not deal with abstruse matters; but they also contain references to the business matters of herself and of her friends, and her observations on these subjects are not at all lacking in acuteness and vigor, and it is quite clear that she possessed a power of consecutive thought and of logical expression. Conceding that the letters are at least fairly good letters, the learned and earnest counsel for the contestants argues that an ability to write cleverly may be the result of an education which was in itself destructive to other valuable mental qualities. It may be that an imbecile may be taught to copy words in a clear handwriting, or to repeat the words of his own or a foreign tongue, but he cannot be so instructed as to be able to think and to observe and to communicate his thoughts and observations

with intelligence and lucidity, without ceasing to be an imbecile. Though Madame de Vaugrigneuse was not a remarkably gifted woman, she had a normal and wholesome mind.

The peculiarity of this case is found in the fact that the propounded paper, if valid as a will, will operate to transfer title to a large sum of money, all of which was during the lifetime of the decedent bound by a trust for her benefit, the principal being withheld from her, and that the trustee, who had actual custody and control of the fund when the paper was executed, is named as a general legatee for $20,000, and as the residuary devisee and legatee, and, as such, will receive the larger part of the property.

The principles and the rule laid down in Matter of Will of Smith, 95 N. Y. 516, 522, 523, have application, though some of the circumstances shown in that case are lacking here. The court in that case said that the relation in which the parties to a transaction stand to each other is often a material circumstance, and may of itself in some cases be sufficient to raise a presumption of the existence of undue influence. It was then added as follows:

"The rule to which we have adverted seems, however, to be confined to cases of contracts or gifts inter vivos, and does not apply, in all of its strictness, at least, to gifts by will. It has been held that the fact that the beneficiary was the guardian, attorney, or trustee of the decedent does not alone create a presumption against a testamentary gift, or that it was procured by undue influence. Coffin v. Coffin, 23 N. Y. 9, 80 Am. Dec. 235; Post v. Mason, 91 N. Y. 539, 43 Am. Rep. 689; Parfitt v. Lawless, L. R. 2 Pro. & Div. 462. The mere fact that the proponent was the attorney of the testatrix did not, according to the authorities cited, create a presumption against the validity of the legacy given by her will. But taking all the circumstances together— the fiduciary relation, the change of testamentary intention, the age and mental and physical condition of the decedent, the fact that the proponent was the draftsman and principal beneficiary under the will, and took an active part in procuring its execution, and that the testatrix acted without independent advice—a case was made which required explanation, and which imposed upon the proponent the burden of satisfying the court that the will was the free, untrammeled, and intelligent expression of the wishes and intentions of the testatrix."

Following this decision, I am of opinion that a case was made here which imposed upon the proponent in this case the burden of satisfying the court that the propounded will of Madame de Vaugrigneuse "was the free, untrammeled, and intelligent expression of her wishes and intentions."

It will be remembered that the decedent had a perfect right to prefer Mr. Carpenter to her first and second cousins, and to give to him the whole of her estate, and that he had a right, by faithful service to her, or by delicate personal attentions, to win her esteem and her affection, and thus to create a testamentary intention in his favor in her mind. It will also be remembered that, if she had a wish and desire to benefit him by her will, there is no legal presumption, arising from his fiduciary relation to her, that such wish and desire was created by his fraud.

It was shown that Madame de Vaugrigneuse was fully informed as to her rights in the estate of her father, and knew that it would pass under her will. She was a party to the agreement made with

Arthur B. Stout, by which his interest as a remainderman was transferred to her, bearing date in April, 1893. She was also a party to the supplemental arrangement made with him in October, 1895. In her will of June 22, 1895, by which Mr. Carpenter received only a moderate legacy, and the residue of her estate was given to her mother or to Grace Church for charities, it is recited that the legacies she then made would probably be paid out of the estate of her father, or from the conveyance from Arthur B. Stout. The subject of her father's estate and will was a matter which must have interested her for many years, and the fact that there would probably be a large amount of property subject to her right of testamentary disposition was discussed freely by Mr. Carpenter with her cousin Mrs. Rutherfurd as early as 1892. She and her mother both made wills in 1895 and 1896, in both of which are provisions which have obvious relation to the conditions then existing, and in neither of which was Mr. Carpenter interested as a residuary legatee. Up to that time, at least, his interest was to tell the truth, as a basis for the making of the legacies to him therein contained. She also knew the amount of the estate. For many years she had subsisted upon the income of part of it. She knew of the sale of the Newport property for $200,000, for that fact is mentioned in one of her letters. She knew of the Ninth street property and its approximate value, for she mentions a sale of property in the neighborhood as bearing on the subject. She knew of the values of the estate, for in her petition for the appointment of Mr. Carpenter as trustee, sworn to by her on June 28, 1899, the value of the estate is clearly stated to be $388,542.58, exclusive of the Ninth street house, valued at $33,-000. In addition to all of this, a carefully prepared statement of the amount of money which would probably pass by her will was shown and explained to her by Mr. Genet at the time of the execution of the testamentary paper of May, 1899. It also appears from the evidence that Mr. Carpenter was greatly esteemed and beloved by Madame de Vaugrigneuse and by her mother and by her brother. The letters of Madame de Vaugrigneuse and her declarations to Mr. Carpenter and Mrs. Carpenter and to others leave no doubt upon this subject. In every will in evidence made by any of these people, Mr. Carpenter is named as an executor. In each of the three wills made by Madame de Vaugrigneuse, Mr. Carpenter is named as executor, and in each of them he is a general legatee for $20,000. In the will of May 31, 1899, and the will of December 30, 1900, both executed after the death of her mother, he is the residuary legatee. By the will of Mrs. Anne Morris Stout, dated February 13, 1896, he is made a legatee for $10,000, though she knew, and the fact was, that, if she should die before her daughter, her estate would be small. By her codicil to this will Mr. Carpenter was made residuary legatee if her daughter should die before her.

The circumstance that Madame de Vaugrigneuse did not prefer her next of kin to Mr. Carpenter in making division of her estate is not inconsistent with the facts shown in the evidence. She made provision for her cousin Mrs. Rutherfurd, and the fact that she did not desire to benefit others of that family appears in her letters on

that subject. It is quite apparent that Madame de Vaugrigneuse was not greatly liked by her cousins, other than Mrs. Rutherfurd; that they rather avoided her society; and that she reciprocated their sentiments. The cousin who is a lunatic and the child of a cousin she never saw were omitted for obvious reasons.

The fact that Mr. Carpenter's name was inserted in the testamentary paper of May 31, 1899, as residuary legatee by her wish and desire appears from the instructions for the preparation of the document, written wholly in the handwriting of Madame de Vaugrigneuse. This was directed to Mr. Carpenter, and is in pencil. Its very informality is evidence that it is her own act. The will of December 24, 1900, is a mere repetition as to this, and is evidence of a continued testamentary wish, after an opportunity for reflection lasting about 18 months.

The wills of May 31, 1899, and of December 24, 1900, were both of them drawn by Mr. Genet, and were both of them executed in his presence, after full and careful examination by her, with ample explanations of their legal effect. It is true that Mr. Genet was selected by Mr. Carpenter, and that he had had business relations with Mr. Carpenter. It would have been more satisfactory if some attorney unknown to Mr. Carpenter had been selected by Madame de Vaugrigneuse, but I do not understand this to be essential. The question in each case is as to whether the paper has been honestly prepared in accordance with the wishes of the testatrix, and duly executed by her with an intelligent understanding of its meaning and effect. Mr. Genet had been employed to prepare an opinion as to the rights of Madame de Vaugrigneuse and Mrs. Stout in the Aquila Giles Stout estate, and his investigations had practically been concluded at the time of the execution of the will of May 31, 1899, though his formal opinion was not completed until August following. He was peculiarly well qualified to explain facts to Madame de Vaugrigneuse, then fresh in his mind. He was subjected to a searching cross-examination by eminent counsel, and the impression he left upon my mind was entirely favorable as to his ability to perform the task imposed upon him, and as to his desire to perform it properly and honestly, and to testify truthfully concerning it. In the sense that he had no personal interest to serve in defrauding the decedent, he was an independent counsel.

I do not find any evidence in all of the bulky record upon which any finding could be based as to any act performed by Mr. Carpenter amounting to undue influence to procure the propounded paper to be made in his favor. I am, on the contrary, persuaded that the provisions contained in it are the "free, untrammeled, and intelligent expression of the wishes and intentions of the testatrix."

No question has been made as to the sufficiency of the formal factum.

Costs of proponent will be paid out of the estate. Tax costs, and settle findings and decree admitting will to probate on notice.

Probate decreed.